Um, so we'll, uh, we'll begin with the United States versus Diaz. Mr. Schuman. Good morning, your honors, and may it please the court. My name is Jacob Schuman, and I represent the appellant, Evan Diaz. May I please reserve three minutes of my time for rebuttal? Done. Thank you. Mr. Diaz filed eight objections over nine months, informing the court that his appointed attorney, Joseph Kalinowski, was refusing to communicate with him, not answering his letters, not visiting him at the prison, not responding to his phone calls. Six months. Can we just get to this important point? There's a point at which I don't think anybody would would would claim that Mr. Council in this matter, but there was a point where he makes a representation to the court, says I've met with my client. We've resolved our differences. And at no point after that, the government emphasizes again, again, again. At no point after that, does Mr. Diaz take issue with that and say, no, I still want I want this guy off. Right. First off, as a factual matter, is that accurate? And second, if it is accurate, what are we to make of it? So it's not accurate in the sense that four times after he filed that motion, Mr. Diaz filed letters with the court, complaining that Mr. Kalinowski was not communicating with him. But in fact, less than a month. But he doesn't say after that, I don't want this guy anymore. Whereas before, he didn't want somebody on the case. He knew how to make that known. And he was pretty explicit about it. So he's not saying that after that. The problem is that there's no we have no way to know whether Mr. Diaz knew that Mr. Kalinowski made that representation to the court. Mr. Kalinowski put that representation in a continuance motion, actually on the second page of the motion. And it was docketed on the docket as just as a continuance motion. So Mr. Diaz reviewing the docket would have no way to know that Kalinowski had made that representation to the court. And less than a month after Kalinowski filed that motion, Mr. Diaz filed a letter with the court saying that, in fact, Kalinowski was not visiting him at the prison. Furthermore, you know, the court told Mr. Diaz when he replaced Mr. O'Brien that if he asked for another lawyer, he wasn't going to get one. That's exactly what he said, is it? Isn't it what he said that if you ask for another lawyer in circumstances like this, you won't get one? No, he said that if I grant the motion, it will be the last time. So there's no so whoever you get off the panel, then that will be it. And so the government when the government puts says that it was an accurate statement of the law. I think that was inaccurate that it wasn't. I mean, you know, what he said is if I grant the motion will be the last time. Whoever you get the panel, then that will be it. So the next time you come in or have a disagreement or feel you couldn't work with counsel or something like that, the result would be that you'd represent yourself. Also, on page 41 of the appendix, the court told Mr. Diaz that if this was his second request for new counsel, that his answer would be no, you've had two lawyers you can represent yourself. Mr. Diaz clearly understood or believed that the court wasn't going to grant him another attorney because he said on page 87 of the appendix that he felt between a rock and a hard place. He wanted to get rid of Kalinowski, but he didn't want to represent himself. So I think the fact that, you know, the court had expressed a one substitution policy, which is improper, and that Mr. Diaz had no way of knowing that Kalinowski had made this representation to the court, that they'd work things out means that the court couldn't just rely on what he specifically made a request for a new lawyer after the after the time of the of the representation by Kalinowski. He never specifically renewed that request. No, he continued to complain. Isn't that significant? I don't think so, because I don't think you can assume that he knew that Kalinowski had withdrawn that request. Again, it was not in a motion to withdraw. It was just in a continuance motion. He didn't. We have no way to know that he actually read had access to the continuance. He was telling the court. I'm not sure that it makes any difference. Well, I think when a defendant files a motion for new counsel, there's essentially a conflict of interest between the counsel and the defendant. And here we have a factual dispute. But he wasn't complaining about that particular issue. He was complaining about a lot of other things. No, he was continuing to complain both that Mr. Kalinowski was not communicating with him. Right. And that he was filing motions without his knowledge, filing specifically continuance motions without his knowledge and consent. So I think the record suggests at least it should set off alarm bells with the district court that there's something seriously wrong with the attorney client relationship here and requires further inquiry. Are you saying that that's the problem, that there was no inquiry? Well, that's that's the air that the court neither never ruled on the motion, but didn't conduct the inquiry into the request for new counsel that this court required and wealthy. And it's also vacated convictions in McMahon for the failure to make the inquiry. And we have no we have. I mean, Kalinowski doesn't doesn't rebut or respond or say anything with respect to whether whether Diaz is correct in all these things. And he didn't respond to the two court orders saying that he needed to respond to to Diaz. That's right. Diaz continues to say that Kalinowski is not communicating with him. Kalinowski never disputes that. And when the court finally orders Kalinowski file a response to Mr. Diaz on the record, Kalinowski blows that off as well. And it's left. The court doesn't take any action when Kalinowski, you know, basically disregards. We have the April 17th letter in the record. We don't have the May 1st letter or the May 3rd as a Diaz letter to Kalinowski. It's noted on the docket, but it's not in the record. You know, he doesn't renew. So he had to renew a motion for new counsel. It's still pending. It's not ruled on. Then then the next thing we know, he goes to trial. Well, now, in June 29th, also, he sends a letter to the court detailing failures to respond again. Kalinowski files the continuance motion on March 24th. And then Diaz files on April 17th, June 27th, June 29th and July 10th, saying that Kalinowski is not communicating with him and also filing continuances without his knowledge or consent. And then we have the trial, August 16th. Right. And there's nothing that he says at the trial. There's nothing in person in court. Again, he never says, Your Honor, this man, I can't go forward with him. He's not communicating with me. I need another lawyer. Right. But I mean, at a certain point, you know, he's filed eight complaints about it. He filed a motion for new counsel. I think at this point he sort of probably assumed that the court was not going to rule on the motion because it had this one substitution policy. Why would it be right for us to assume that and not to assume what we usually assume, which is if a lawyer makes a representation, it's truthful. And if a lawyer makes a representation, the client knows about it. So I think it's down by it. Sure. There's two reasons. First, I think with respect to a request for new counsel, because it creates a conflict of interest between the attorney and the client, these need to be handled a little bit more carefully. And that's why this court has required it on the record inquiry in the presence of the defendant. Well, wait, wait, wait. When you say we've required it, in what case have we said that's a requirement? On McMahon. So give me the language, exactly. Because the government's pretty express in saying that they've never held that. There needs to be an on-the-record inquiry as to the reasons for the defendant's dissatisfaction. And then McMahon found error because the court relied upon counsel's communication that he knew of no reasonable basis for his discharge. And counsel's emphasized in the original of the opinion. So I think that shows that just relying on defense counsel's representations is not enough. Now, in Hodge, the court said that you could just rely on defense counsel's representations. But in that case, the inquiry was made in the presence of the defendant, and he had the opportunity to respond. And this court emphasized that. Right. Well, but it was not said in Hodge, hey, wait a second, this is different because it's in the presence of. It was a statement that the court was entitled to rely on the representation of counsel, right? Well, I mean, I think Hodge emphasized those two points because, I mean, that's the way I think you can make sense of Hodge and McMahon. McMahon seems to suggest you can't just rely on counsel. And Hodge says you can. And in that case, it was in the presence of the defendant, and he had the opportunity to respond. But the other point I'd make, not just a general point that motions from your counsel are different, but the record here I just think is so uniquely bad in demonstrating a breakdown in communication  What are we to make of the fact that he had the same problem with the first lawyer? Well, he actually didn't have the same problem with the first lawyer. He didn't like his first lawyer, but he acknowledged, this is at page 5051 of the appendix, that O'Brien did visit him at the prison multiple times. So he wasn't complaining about a breakdown in communication with O'Brien. He was complaining that he wasn't filing motions of various kinds. That's right, and that wasn't good cause. A lot of different kinds of motions as well. You have to take each request from your counsel on its own merits. In the McMahon case, the defendant turned down the services of the public defender's office, fired two successive attorneys, wanted a continuance to get a fourth attorney. The court didn't conduct an inquiry, and this court said that was error. So you essentially got to take each request on its own merits. Now let me take you back to the language about your assertion that the court made a statement that you have a one, this is it. The way the appendix reads, as I understand it, is that next time you would come in and have a disagreement or feel you couldn't work with counsel or something like that, the result would be you will represent yourself in this case. That's the actual language, right? Yeah, I mean, he says that right after saying it'll be the last time, whoever you get the panel, that's it. Yeah, but that's the statement. Next time you would come in and have a disagreement or feel you couldn't work with counsel or something like that, the result would be you will represent yourself. Now the government says that's an accurate statement of the law, that in fact it requires something more than your mere disagreement or that you don't like working with somebody. That would be accurate. If you interpret the statement that way, that would be fine. In fact, even if the court didn't have a one substitution policy here, when we put that forward, we're just trying to explain what happened here. The court completely ignored the request for new counsel, and that's the error. The error is not conducting the inquiry. The court did not completely ignore it. The court had a representation from defense counsel saying, we've got this resolved, we can go forward. That's not ignoring it. That's accepting what counsel's representation is. Why is it reversible error to rely on what defense counsel says? Because this court said that when you request a new counsel, the court has to do an on-the-record inquiry into the reasons for the defendant's dissatisfaction. And you can't just rely on defense counsel's say-so in a written motion for a continuance that we have no way to know if the defendant even knew it was filed. So, you know, we don't know whether the district court was enforcing its one substitution policy, was relying on Kalinowski, simply forgot about this because there's nothing in the record. The court never conducted an inquiry and never ruled on the motion, and that's error. Three weeks later, three weeks after that motion's filed, Diaz writes again and says he never responds and he never visits. It would seem the court then would question the representation, it would seem. Yeah, I mean, when you have such a clear factual dispute between defense counsel and the client on whether or not they're communicating and whether or not the client wants to continue with defense counsel's representation, that's really a unique situation, and that's why we require this inquiry from Welty. If the court has any other questions on that, I can move on to the second issue in this case. The government introduced patently inadmissible evidence from the case agent at trial, first that Mr. Diaz was guilty. The case agent said, I've investigated this, and based on the investigation, I can tell you Diaz was bagging for guzzman. Government doesn't even defend that testimony in its response. Of course, this is plain error. Yes. So how does this affect substantial rights when you get right down to it? There's plenty of testimony. Sure. So the test for substantial rights is whether this court can be confident in the outcome or whether there's a reasonable probability that the verdict was based on the inadmissible testimony. And in this case, the government was very deliberate in how it used Officer Gullah's testimony. Put him on the stand. We're familiar with all that, so you don't have to run through it, but you do need to answer Judge Rendell's question. How is it that given all the other evidence in this case, including guzzman's and another co-defendant's very direct testimony that the guy was in it and he was in it up to his eyeballs, that there is a, we've got a circumstance here where there's a clear probability there would have been a different result. Sure. So the only direct evidence of his involvement in this conspiracy was guzzman and Alvarez's testimony. They were both cooperators. Well, yeah. That's pretty dang good, isn't it? I don't think so. I mean, the key to the defense argument was that you couldn't trust them. They were trying to get a deal for themselves. Alvarez is guzzman's mother. He's doing everything he can to keep her out of prison. No question that you could make those arguments, and no doubt those arguments were made. Even a lawyer as challenged as Mr. Kalaski made those arguments, and they lost. Well, it's not a sufficiency of the evidence test. You know, we can still win even if without Gullah's testimony, the jury still would have convicted. The question is not was the evidence sufficient to convict. The question is, is there a reasonable probability that the verdict was based on Gullah's testimony? And given how thin, I mean, I agree that there was evidence against him. That's where you put the rabbit in the hat, right? When you say given how thin. No, I mean, look. You've got two people coming forward. They're dirty. They're dirts all over the courtroom, and it's pointed out. But the jury's entitled to listen to them, not just listen to them, but, you know, that's pretty, that's, when you say it's thin, that's a defense perspective, thin because they're biased, you say. They may have convicted without Gullah's testimony, but that's not a question on prong three. And the fact that they were dirty and it was pointed out is the whole point here. But what if Gullah hadn't testified? What if you throw that out? You still have all these tape recordings. And while he may have thrown in, you know, oh, that's talking about heroin or whatever, you have them talking to each other, and, you know, they're not just passing the time of day. I mean, you know, there's multiple interpretations you could take from these calls. If there's multiple interpretations, doesn't that say that, in fact, Gullah's testimony should have been okay because it was all coded? I mean, when you, how can you have that both ways, Mr. Shuman? On the one hand, you've made the argument quite persuasively that Gullah's testimony is completely improper because these things speak for themselves. And then you stand before us and say, well, there's multiple interpretations here, so that's really not significant evidence. How can it be both? Well, what the court said in Jackson is that if a call's meaning is unclear but there's no code, then an officer can't testify as to what the jury should infer. And I'd say the calls here were unclear, but there wasn't any code. And, you know, essentially this case came down to do you believe the cooperators? And what the government did is it put Gullah on the stand to bolster the cooperators. It didn't come down to do you believe the cooperators. It came down to do you believe the cooperators and do you believe the words out of Mr. Diaz's own mouth as recorded in these tape-recorded conversations. Do you believe, how do you interpret these calls, and do you believe what the cooperators are saying? Okay. Any other questions? Okay. We'll have you back on rebuttal. Thanks, Mr. Shuman. Mr. Camone. Good afternoon, Your Honors. May it please the Court. My name is Sean Camone and I represent the United States of America. Your Honors, this Court should affirm the District Court's verdict and sentence in all points. Welty and McMahon did not hold in any way that a failure to conduct an inquiry results in a reversal. Okay. We'll take on directly Mr. Shuman's assertion that McMahon says you've got to have an on-the-record inquiry when there is a motion for new counsel. Your Honor, the first thing I would say is that McMahon and Welty both rest their holdings on the fact that there was a deprivation of the right to counsel under the Sixth Amendment because both of those defendants went to trial pro se without representation and there was no meaningful inquiry into whether they had a knowing and intelligent waiver of the Sixth Amendment right to counsel at trial. But answer the specific question that is put to you by Mr. Shuman's assertion that McMahon actually holds there must be an on-the-record colloquy. Does it say that or not? Your Honor, I don't read it to say that and I read the Hodge decision, which came later, to say specifically that a failure to conduct a one-on-one colloquy with the defendant is not reversible error. The court did not hold in Welty that such a colloquy between the judge and the defendant is required in every instance and we do not require that now. Such a per se requirement would be encroaching into the province of the trial judge and this is the key language, Your Honor. We recognize that the district court can ascertain whether good cause exists by using various sources and we decline to require that in every instance it must question the defendant directly. Hodge never held that the only reason that the colloquy of defense counsel was okay was because the defendant was present. It said specifically that various sources are fine, that all you need in the record are the reasons for which the defendant is requesting substitute counsel and here the record is replete with the defendant's complaints and it's in his written submissions to the court, so the reasons were on the record. And the reasons would give rise to a duty to inquiry, would it not? He doesn't respond and he hasn't visited me and even after there was a motion for continuance that said to the judge, oh, everything's fine, repeatedly he said, you know, three weeks later, he says he never responds and he hasn't visited me. Doesn't that give rise to a duty to inquiry and bring Kalinowski in here and say what is going on? And Kalinowski may have said, well, I visited him but he wasn't available or may have refuted, but all we have is Kalinowski twice refusing to comply with the court's order that he respond to DS. Which for all we know, Kalinowski, you know, is out of the country for eight months. For all we know on this record, he has done absolutely nothing with respect to this case and wouldn't a judge have the obligation to bring him in and say what is going on here? Especially because he's already told the defendant, listen, if you have a problem with this guy, you're going pro se. So, Your Honor, to answer your question directly, no, there would be no such requirement to bring the defense counsel in and inquire of him directly. Why not? Why wouldn't? There's a total breakdown of communication here. The only thing we have on the record is that there is. Shouldn't the judge figure out whether that is in fact correct? Respectfully, Your Honor, with the record that we have, there is no complete breakdown of communication. How so? First, we have the representation from counsel on March 24th that he met with his client the day before, that they resolved all of their issues and that Mr. Santos-Diaz said that he wanted to continue with Mr. Kalinowski as counsel. Well, I don't know that that was, it didn't say that. It said we resolved our issues. And it said that he has expressed that he wants me to continue as counsel. Okay. Then three weeks later, Diaz writes a letter that he doesn't visit. There's conflict here. Doesn't the judge have to resolve it? On April 7th, there was a pretrial conference where Mr. Santos-Diaz, Jody Kalinowski, sat at counsel's table together before Judge Mannion. I was present. The lead AUSA Evan Gottlob was present. Mr. Guzman and his counsel were present. And Judge Mannion did ask counsel. Where is that in the record? The transcript was not on the record, Your Honor, and I don't know why. We can't take representations. I'm not going to make any representations about what went on at that hearing, Your Honor, because it's not directly relevant. I'm not saying that the judge inquired of Mr. Santos-Diaz as to the issues with counsel. The fact is, though, that Mr. Santos-Diaz, and this is on the record in the scheduling order. I don't remember what docket number it is, but the scheduling order setting the pretrial conference date for April 7th. That was after the representation was made on March 24th. Santos-Diaz sat next to Mr. Kalinowski at table. He did not raise any issues about counsel with the judge. That's not on the record. Your Honor, the fact that there was a hearing is on the record. Okay, fine. But what happened at that hearing is not before us. I don't, with apologies, I don't know why the transcript was not on the record. I can supplement the record. For some reason, the notations from the court reporter were sealed. Well, I mean, if there was an affidavit in our record to that effect, but we have nothing to say that he was absolutely satisfied. You know, it would be helpful if the parties got together on that. If, in fact, there is a transcript, even if it's sealed, you know, you can give us a rejected transcript. Because if there is, in fact, a record of Diaz sitting next to Kalinowski at a pretrial conference and saying nothing about, I don't want this man as my counsel, that seems like a relevant fact and one that ought to be available to us. And, Your Honor, again, with apologies to the court, I did not learn of the existence of a sealed transcript until about two days ago. Yeah, but somebody, I mean, if you were sitting at that table, then you knew that that event happened. I mean, that strikes, you're making the argument now, so clearly you think it's significant. And that's absolutely fair, Your Honor. It would be great to have that information, and I'll ask the parties to make sure you look into that and you supplement the record within, you know, a reasonable time. I would think that ought to be doable within a couple weeks, isn't it? Yes, sir. Yes, sir. All right. Well, then I'll ask you to get with Mr. Schuman and make sure the record gets supplemented in that respect. Certainly, Your Honor. And in addition, there is information on the record to show that Kalinowski did make contact with Mr. Diaz after that request was made. At Appendix 120, this was a June, one of the June letters that Mr. Diaz wrote to the court, he says that I haven't gotten the rest of my discovery. He's not saying I haven't gotten any of my discovery, so clearly he had some discovery. Some of that discovery that he was looking for was information about the people who would testify against him. That's Jenks material. The court knew that he wasn't entitled to Jenks material until trial started. Well, with the time you've got, unless my colleagues have further questions about this, I want to ask you about this testimony from Officer Gula, which – I'm just dying to know how it is that statements like, you know, the bags are different sizes, right, requires the expert testimony of an officer to say he's talking about the bags he was utilizing to bag up narcotics. You know, how is that a fair expert opinion and not just a law enforcement officer saying, this is what I want you to believe, take it, even though the guy said nothing about narcotics? Well, first, Your Honor, I would say that the government does not contend that this was an expert opinion, but your point is well taken. I thought you were making this as a 701B argument, no? 701B, Your Honor, not expert testimony, but lay opinion testimony. Excuse me. I mean, the only reason it can be valid as opinion testimony is on the basis that he knows something they don't, right? Otherwise, it's nothing. So it's got to be some kind of expertise that's being brought to bear, or it clearly would be irrelevant, right? Yes, Your Honor. Okay. So I'm not confused. I don't think anybody is who we're talking about 702. We're talking about 701B, and we've got some law on that. So the question to you is, how does Gula get away in the courtroom in response to questions like the bags are different sizes, right, saying he's talking about the bags for narcotics? And I think, Your Honor, if there was an objection during trial, the trial judge would have been well within his discretion to exclude that testimony. And if there was error, then it's not clear error because there was no prejudice. I think this is a lot like the Jackson case. It is a lot like Jackson. Jackson talked about sua sponte, that the court had the obligation, but there it was not plain error. You don't contend that these are coded, do you? These are not coded statements on these phones. Not that message, Your Honor. There are a few of the messages that are deliberately ambiguous and abrupt. But, no, Your Honor, I would not say that it's code in the same way that many of the – that some of the typical intercepted messages are code. What I would say is that it is much like Jackson and Fulton, where it may fail on the helpfulness prong. It may not be helpful to the jury. But just like in Jackson, the jury would have had access to the text messages and calls. They could have reinterpreted them for themselves. There was overwhelming evidence in addition to – the appellant asked the court to believe that the only direct evidence of the conspiracy was the testimony of the two co-conspirators, and it's just not true. Aside from the calls and texts where Mr. Santos-Diaz was involved, there were other calls and texts where he was mentioned by other co-conspirators. But there is an emphasis here by your defense counsel colleague that we should be hard-pressed to say there's not a probability that the jury was influenced to convict on the basis of what you seem to be acknowledging yourself was testimony outside the bounds. That this person, Gula, had no right to be saying in the face of unambiguous – I mean, the bags are different sizes, there's nothing mysterious about that – to then say, yeah, what he means is the bags that they're bagging narcotics in. And based on his investigation and training and experience. So that's the point you need to address. Why, even under plain error, is there not a problem here? Explain why that's not a problem. Because, Your Honor, any potential prejudice was mitigated both by the overwhelming evidence in addition to that, as well as the fact that on cross-examination, Officer Gula was led to admit that most of what he was basing things like the bags being different sizes means bagging heroin, the $100 was payment for bagging heroin, was based upon his interviews of Jeffrey Guzman. So at base, this is a hearsay problem, and Jeffrey Guzman testified at the trial. And he testified exactly the same way on the same calls. How are we supposed to get officers to stop doing that? How are we supposed to get prosecutors to stop asking those questions and teeing that stuff up? If we say this in Jackson and we get back here and we're dealing with the same thing again, how do we get the message across that this is improper? Well, first, Your Honor, I think that trials are not perfect. There are errors made in every trial. Yeah, that's true. But in the face of what we've said before, isn't this pretty egregious error? Isn't this pretty bad in the face of what we said to have a prosecutor put a witness on the stand and get them to say over and over again stuff that we've said you're not supposed to do? So, first, Your Honor, I would say that you have to look at each of these calls and messages that were interpreted individually. Because there are only a couple that you can characterize in the way that you've been asking where he completely went outside the bounds. I would suggest that's not correct. I think we look at the totality of all these questions. And he's just wrapping this up in a little package and putting a bow on it. There are so many of these where it's not coded. And he says, come on, come on, the guy is at barbershop waiting for me. And Officer Goula goes, this is significant. Because during the course of the investigation, we identified the location of da-da-da, which is approximately da-da-da-da-da. This is significant. Come on, the guy is at the barbershop waiting for me. You know, he's just wrapping it up in a little package and putting a bow on it. The whole thing is just, you know, telling the jury and based on my experience. And this is significant. You know, I've interviewed in the past. Based on my training experience and coded language and cooperatives and defendants, I've interviewed in the past. I mean, this is really very, it's kind of piling it on, if you will. Your Honor, I believe the call that you're referring to in that instance was the one in reference to food. Yeah. And in that case, Goula erroneously testified that food, and if I may, Your Honor, he testified that food meant dog food. That was how he interpreted it contemporaneously when the call came in. That was what he had put in his search warrant affidavit because that's how dog food and food are code words for heroin. Jeffrey Guzman told us in later interviews that in that instance. McDonald's. In that instance, it was McDonald's in payment as part of the payment for bagging the heroin. Exactly. If you notice on redirect, AUSA Gottlob corrected the record on that to try to get Goula to remember that. Even so, but that just heightens the problem here. He's saying it's narcotics and it's, you know, a hamburger. At the end of the day, you've got to lean hard on plain error and say, hey, the evidence is so overwhelming that even without this, there surely wouldn't have been an addiction, right? I think that is true, Your Honor. All right. Well, with the time you've got remaining, can you talk to us about attributing 30 grams of heroin to DS? There's, everybody seems to agree there's 15 grams in your briefing. You seem to agree, yeah, 30 grams. Well, we only have to get to 20. That's how I take your briefing, right? You get to 20 grams and you're close enough. Well, I would say that because 20 grams is the next level on the guidelines, that that's really the only threshold we need to pass to avoid reversal on that. Right. So I don't take you as suggesting that, you know, there's enough in this record to double the 15. You seem to be arguing we can get five more out of this. I think it's a much easier row to hoe to say five more, Your Honor, but I think 30 is reasonable. How do you get, there's one occasion on which Guzman says DS bagged one. No, Your Honor. No, I'm sorry, one other besides the 15 gram, right? That's correct, Your Honor. I see my time has expired. Just stick with me. One other besides the 15 gram. At least one other, Your Honor. Guzman testified he bagged at least twice for me. And he said that he bagged 500 bags on one occasion for $100. Right. He also said that Santos Diaz had recruited individuals from a halfway house to test heroin to ascertain the quality before Guzman put it on the street. There's also calls where Santos Diaz is calling and attempting to get more heroin to deliver, and there were calls where. Right, and those come up short, right? No, Your Honor. Because anything that's reasonably foreseeable from his actions within the scope of the conspiracy, he's responsible for. It's a three-week period or three-month period. Within the period of the conspiracy, yes, Your Honor. Whether it's charged or not, it's sentencing. Anything that he did within the scope is. I understand that. What I'm trying to get at is, what I'm trying to find out is, what is it that you can point to that makes it reasonable to say there's five grams more there? There's five grams more. So is it there a frequency? Can you point to something about frequency of Diaz's involvement? Anything that Guzman said about how much happened on that second occasion? How are we to know, okay, there was a second occasion? How are we to know how much was involved there without just guessing? Your Honor, there is. First of all, it's not guessing. It's estimation, which the case law says is permissible at this stage. Stop. How can you say it's estimation if nobody says anything? There's nothing in this record, nothing, except for 15 grams on that first occasion, and then we know there's another occasion. Are you saying you're estimating because it was 15 grams before? So there is a permissible inference to be made. One way that you could read Guzman's testimony is that he paid him $100 per 500 bags. That was the rate at which he paid him. And if he bagged at least twice, then it's reasonable to infer that what Guzman was testifying to was $100 each time. Stop. Why is that reasonable? Why is it reasonable to say because he said $100, got 500 bags the first time, what is it that he says about the second occasion that allows you to say there was $100 then, and that means 500 bags? I'm basing it on the wording that Jeffrey Guzman used, Your Honor. It's a permissible inference to draw based on the wording. Give me the wording. Give me the wording and tell me why that's a proper inference. He did not say that I paid him $100 on the first time. He said I paid him $100 per 10 bricks. Right. So $100 per 10 bricks and he bagged for me at least twice, it's reasonable to infer that he's saying he bagged 10 bricks for me at a time. Okay. And Magdalena Alvarez testified that she saw Santos Diaz bagging those drugs on two occasions. So she herself was... How much? Right, that's correct. She didn't understand drugs. She wasn't even sure what it was. But she knew who it belonged to and she knew basically what he was doing and said that he was doing it twice, and Guzman said it happened at least twice at $100 per 10 bricks. He didn't say it happened at least twice, Your Honor, because if he said that I wouldn't be asking these questions, right? He didn't say it explicitly. That's correct, Your Honor. It's a reasonable inference. It's a reasonable way to take his testimony that that's what he was testifying to. All right. Thank you. Thank you, Your Honor. Mr. Schuman. My friend mentioned the cross-examination of Officer Gullah. When he was cross-examined on the basis for his interpretations of the calls, he said again and again that they were based on the entirety of the investigation, and that's language that multiple courts have condemned as a basis for interpreting these kinds of calls because it leaves the jury to suspect or to believe, to trust, that the officer has some information from having done the investigation that they don't have. Okay. And they seem to even be conceding on the government side, yeah. We're coloring outside the lines here. It was wrong. Right. But it's not plain error because you had taped calls. You had co-defendants testifying. You had overwhelming evidence of this guy's guilt. So bad, yeah, but not plain error. What's wrong with that argument? So I don't think that it's overwhelming compared to Jackson and Fulton. In Jackson and Fulton, you had surveillance footage of the defendant committing the crime. In Jackson, you had two co-conspirators on the calls testifying against him. You had documentary evidence, including drug packaging materials, receipts, and you had surveillance by law enforcement officers of the defendant engaging in criminal activity. And so from all of that, the jury could have inferred that these calls in Jackson reflected drug activity. But here, you really don't. Mr. Diaz is on 11 of over 2,000 of the dirty calls. He's seen only twice at Guzman's house, both times fairly innocuously. There's no drugs or drug packaging material found in his room. So, you know, the calls don't overtly mention drugs. And, you know, it could be that the jury rejected the attack on the credibility of Guzman and Alvarez. But what's key here is they might have assessed that testimony differently if it weren't for Gula's testimony. Is that the standard? The reference to the barbershops, what do we make of that? It is the standard. It's a reasonable probability test. And that's from Payano this summer. But in terms of the barbershop, I mean, that wasn't code. That was literally a barbershop across the street. I understand that. No, but just in terms of the statements that was in the record, was it not? There was a record. Independently of Gula or was it only Gula? There was a call where Gula or, sorry, Guzman and another co-conspirator were talking about the barbershop, and they said, where's Evan? And Gula testified that they're asking for Evan to go to the barbershop to buy or deliver drugs. That was the only reference to Mr. Diaz with respect to the barbershop. He was seen once walking into the barbershop or stopping into a car in the barbershop parking lot, but that's it. But, I mean, essentially here, you know, like, as I said, the case comes down to whether or not you believe the co-operators. And the jury might have viewed their testimony quite differently if it didn't have Officer Gula's inadmissible testimony to bolster it. And I do think, Your Honor, that the government needs a clear message here that this testimony is unacceptable. This is just like what this court said was egregious violation of lay opinion testimony in Jackson, and it's all over the place in this case. And they made it the centerpiece of their case. They emphasized it twice in summation. And maybe we'd be able to send that message pretty clearly if there had been objection. But when there's not objection, it makes it tough. I agree, and I'll mention it in my next CLE event. Yeah. Okay. Thanks, Mr. Shulman. Spread the word. Appreciate the counsel's argument. We've got the matter under advisement.